UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.),

                       Plaintiff,                  22-CV-1001 (SIL)

ANN ANISA ALI,
HALLIMA ALI,
ROBERT RAMCHARITAR, *and*
STEPHEN ALI,                                     FINDINGS OF FACT &
                                                          CONCLUSIONS OF LAW
                    Defendants.

-------------------------------------------------------------X
**STEVEN I. LOCKE, United States Magistrate Judge:**

The following constitutes the Court's Fed. R. Civ. P. 52 findings of fact and conclusions of law in this life insurance proceeds-interpleader action, following a bench trial held on January 30, 2024. *See* DE [53] (citations to the trial transcript are to "Tr."). At its core, this case is about two brothers' competing claims to the proceeds of their deceased mother's life insurance policies.

Decedent Zaimoon Ali ("Zaimoon") held two life insurance policies with Plaintiff John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), the proceeds of which total $89,052.07. *See* Complaint ("Compl."), DE [1]; Amended Receipt, DE [31]. On February 24, 2022, John Hancock commenced this interpleader action requesting that the Court resolve the conflicting claims of the defendants: (i) Stephen Ali ("Stephen"), Zaimoon's son; (ii) Robert Ramcharitar ("Ramcharitar"), also Zaimoon's son; (iii) Ann Anisa Ali ("Anisa"), Zaimoon's niece; and (iv) Hallima Ali ("Hallima"), Stephen's ex-wife and Zaimoon's former daughter-in-law. *See* Compl., DE [1]. Only Ramcharitar and Stephen answered the Complaint, *see* DEs [12], [40],

1

and the Clerk of Court issued certificates of default against Anisa and Hallima. *See* DE [16]. On March 28, 2023, the parties stipulated to John Hancock depositing $93,459.90 plus interest, minus $5,000 in attorneys' fees and costs, with the registry of the Court. *See* Minute Order, DE [30]. On April 3, 2023, John Hancock deposited $89,052.07 with the Court, representing the proceeds of the relevant policies, plus interest, less attorneys' fees and costs. *See* Amended Receipt, DE [31]; Declaration of Owen Andrew Kloter, DE [33]; Minute Order dated May 2, 2023, DE [35]. John Hancock was dismissed from the case on August 30, 2023. *See* Elec. Order dated Aug. 30, 2023.

## I. FINDINGS OF FACT[1]

On October 7, 1991, while living in New York and holding a New York bank account, Zaimoon applied to John Hancock Mutual Life Insurance Company[2] for a life insurance policy, which bore the number XXXXXX230 ("Policy 230"). Exhibit ("Ex.") 20; Tr. 82:10-15, 113:19-20, 136:13-14, 159:20-161:3. Zaimoon held a second life insurance policy with John Hancock bearing the number XXXXXX688 ("Policy 688"), although the application for Policy 688 is not in the trial record. In her application for Policy 230, she elected as beneficiaries her "husband if living, otherwise, Stephen S. Ali, son[;] Teddy I. Ali, son[; and] Robert R. Ramcharitar" in "equal shares or [to] the survivor[.]" Ex. 20 at 3. Zaimoon's husband predeceased her. Tr. 10:9-18.

---

[1] In order to save costs, this trial was conducted entirely by video conference, with the consent of the parties.
[2] John Hancock later did business as, *inter alia*, John Hancock Life Insurance Company (U.S.A.). *See* Ex. 2.

2

On May 9, 2000, Zaimoon executed a change of beneficiary form with respect to Policy 230, naming as beneficiaries her sons Stephen, Teddy I. Ali ("Teddy"), and Ramcharitar, equally or to the survivor, if any. Ex. 1 at 2. Then, seventeen years later, on December 5, 2017, Zaimoon executed another change of beneficiary form applicable to both Policy 230 and Policy 688 (collectively, "the Policies"), identifying Stephen, Teddy, and Ramcharitar as primary beneficiaries, each entitled to "33 1/3 %" of the proceeds of those policies (the "December 5, 2017 Change of Beneficiary Form"). *See* Exs. 2, 21. At some time prior to December 13, 2017, Zaimoon moved from New York to live with Teddy in Port St. Lucie, Florida. Tr. 136:5-14; *see* Ex. 2. In 2020, Teddy passed away. Tr. 109:24-110. On May 8, 2020, Zaimoon changed the beneficiary distribution of the Policies, so that Stephen and Ramcharitar would each receive approximately one-third of the proceeds, and Anisa would receive a portion of the remaining balance. Tr. 11:4-13, 110:9-14, 136:22-137:3.

On September 13, 2021, Zaimoon executed a notarized quitclaim deed (the "Deed") granting Stephen title to a house at 1038 SW Whittier Terrace, Port St. Lucie, Florida, 34953. Ex. 4; Tr. 6:18-20, 18:4-24, 136:5-11. Around the same time, she was diagnosed with breast cancer and admitted into a hospital, identified in the record only as "Tradition." Tr. 19:25-20:14, 23:8-18, 140:15-23. On or around October 9, 2021, she was admitted to a hospice called Trustbridge in Palm Beach County, Florida. Tr. 25:14-26:11; Ex. 10 at 1. Ramcharitar offered testimony that Zaimoon was not administered morphine at Trustbridge. *See* Tr. 29:3-7, 30:7-12, 67:3-7. The Court nevertheless rejects this testimony in light of medical records to the contrary

3

demonstrating that Zaimoon received subcutaneous morphine intermittently at Trustbridge, including on October 9, 2021. Ex. 10 at 1, 2, 4. Nevertheless, Zaimoon was described as "alert" and "oriented" by Trustbridge medical personnel on October 9, 10 and 20, 2021. Ex. 10 at 2, 3, 7. Further, Zaimoon was visited by hospital volunteers on October 14, October 15, October 18, and October 21, 2021. Ex. 9. These volunteers described her as "alert and responsive" on October 14 and October 21, 2021; and "awake and alert" on October 18, 2021. *Id.* at 1, 3-4. The volunteer who visited her on October 15, 2021, Joseph Zarcone, stated that "Zaimoon and [he] spoke, and she offered [him] her life advice," as well as her "experiences of living in New York City." *Id.* at 2. Moreover, Sheryl Ali ("Sheryl"), Zaimoon's niece, testified that she spoke to Zaimoon on the phone "every day" between September and November 2021, with their final communication occurring two days before Zaimoon's death. Tr. 123:8-17. During these conversations, Sheryl testified, Zaimoon was "mentally . . . competent" and "talk[ed] . . . normal[ly]." Tr. 123:25-124:8. Sheryl further emphasized that there was "no" difference in her cognitive ability, and that Zaimoon's illness was not apparent during their communications. Tr. 124:3-12. Anisa and Zaimoon also spoke on the phone and via Facetime frequently, often multiple times a day. Tr. 97:25-98:2, 101:6-20. During these calls, Zaimoon communicated clearly and did not "appear confused at any time." Tr. 98:3-10.

Shortly before October 15, 2021, Ramcharitar and Zaimoon called John Hancock and requested to change the beneficiaries on the Policies. Ex. 6, Recording

4

of Undated Phone Call; Tr. 36:22-37:3.[3] During that phone call, Zaimoon stated that Ramcharitar was authorized to speak on her behalf and explained that he was helping her because she was in a hospital bed, but that she wanted to complete the policy changes herself. Ex. 6. She also carefully spelled her name at the operator's request, articulated her date of birth, and stated the last four digits of her Social Security Number. *Id.* Ramcharitar explained to the operator that he needed to hold the phone for Zaimoon. *Id.*

The operator informed Zaimoon and Ramcharitar that beneficiary designation changes could not be completed over the phone, and Ramcharitar and the operator discussed the form required to change a beneficiary designation. *Id.* On October 15, 2021, while Zaimoon was in hospice, Ramcharitar filled out and Zaimoon signed a change of beneficiary form on Policy 688 and Policy 230 ("October 15, 2021 Change of Beneficiary Form"), so that Ramcharitar would receive 90% of the proceeds, and Anisa and Hallima Ali ("Hallima"), Stephen's ex-wife, would receive five percent each, but Stephen would receive no proceeds. Ex. 3 at 5-6; Ex. 11; Tr. 27:17-20, 39:22-40:4. Zaimoon's signature was witnessed by an unidentified individual. *See* Ex. 3 at 8; Tr. 40:5-9. The next day, on October 16, 2021, Zaimoon executed a power of attorney (the "Power of Attorney") in favor of Ramcharitar. Ex. 5, Tr. 26:23-27:20. On October 20, 2021, John Hancock mailed Zaimoon a letter confirming that the changes requested in the October 15, 2021 Change of Beneficiary Form were in effect. Ex. 11.

---

[3] Both Ramcharitar and Stephen offer recordings of Zaimoon prior to her death as evidence. *See* Exs. 6, 13, 15-19. Although these recordings implicate hearsay rules, neither party objected to their admission, and so any such objection is waived. *See Atl. Specialty Ins. Co. v. Coastal Env't Grp.*, 368 F. Supp. 3d 429, 452 (E.D.N.Y. 2018), *aff'd*, 945 F.3d 53 (2d Cir. 2019).

5

In late October 2021, Zaimoon left a series of voicemails on Stephen's telephone. *See* Exs. 15-19. Initially, on October 22, 2021, Zaimoon left a largely inaudible voicemail in which she sounds distressed, asking Stephen to come see her at Trustbridge. Ex. 19. In a voicemail dated October 24, 2021, Zaimoon asked Stephen to return her call and stating "something going on there. I need you to know what is going on," but not explaining what was "going on." Ex. 15. On October 25, 2021, Zaimoon left a voicemail to Stephen asking him to explain what a power of attorney is, stating that she "[did not] know what [Ramcharitar] want[ed] to do with" the Power of Attorney, and asking if a power of attorney is "a good paper." Ex. 16. On October 28, 2021, Zaimoon left another voicemail, which is difficult to understand, during which she became increasingly upset. Ex. 17. In this voicemail, Zaimoon stated that she had "no more money to give to Robert" and explained that Ramcharitar frequently asked for her "ATM card" to withdraw money from an ATM machine. *Id.* Further, Zaimoon stated that "everything [was] money, money, money" with respect to Ramcharitar, and that he had offered to order her checks, which she declined. *Id.* Zaimoon explained that she had "no wallet" with her and repeatedly asked Stephen to come visit her. Finally, Zaimoon stated that "Robert . . . [took] advantage of [her]." *Id.* On October 29, 2021, Zaimoon left Stephen the final voicemail in evidence, which is largely inaudible, asking him to "bring some stuff to wash [her] hair" because her "head [was] stinking." Ex. 18.

Approximately two weeks after Zaimoon executed the Power of Attorney, on or around November 1, 2021, she was moved to a second hospice facility (the "Second

6

Hospice Facility"), the name of which is not in the trial record. Tr. 68:6-17. Ramcharitar did not alert Stephen to Zaimoon's relocation. Tr. 63:17-64:7. She was administered morphine at the Second Hospice Facility. Tr. 67:8-18, 68:11-12. In an undated video taken there, Zaimoon spoke to Ramcharitar and identified him, by name, as her "last son." Ex. 13. In that video, Zaimoon confirmed that she "g[a]ve that power [of attorney] to . . . Robert," and that she gave Ramcharitar her debit card to purchase and bring her supplies. *Id.* She was being treated with morphine at the time of that video. Tr. 67:8-17. Sheryl and Anisa, Zaimoon's nieces, testified that Ramcharitar used Zaimoon's debit card to purchase items that Zaimoon needed. Tr. 102:11-16, 127:10-17. On November 6, 2021, Zaimoon executed a Designation of Health Care Surrogate, authorizing Ramcharitar to "make health care decisions and to provide, withhold, or withdraw consent on [her] behalf," among other powers, and designating Anisa as her alternate surrogate. Ex. 12 at 1; Tr. 48:11-16. Anisa visited Zaimoon in person in mid- to late November 2021, for approximately four days, during which time Zaimoon was "very" lucid. Tr. 96:18-22. Zaimoon passed away on December 2, 2021. Tr. 82:15.

At present, Stephen and Ramcharitar live in Florida, while Anisa and Hallima live in New York. *See* Tr. 1, Appearances, 100:8-9; Ex. 3 at 5.

## II. CONCLUSIONS OF LAW

Having found the facts above based on the credible evidence, the Court now evaluates Defendants Ramcharitar's, Stephen's, Anisa's and Hallima's entitlement to the proceeds of the Policies. "[I]nterpleader is designed to protect stakeholders from

7

undue harassment in the face of multiple claims against the same fund, and to relieve the stakeholder from assessing which claim among many has merit." *JP Morgan Chase Bank, NA v. Meged Funding Grp. Corp.*, No. 23-CV-2605, 2024 WL 3995052, at *3 (E.D.N.Y. Aug. 29, 2024) (citation omitted).  An interpleader complaint "generally involves a two-stage inquiry":  at the first stage, the stakeholder must "demonstrate that the requirements for interpleader have been met and that it is entitled to a discharge." *Id.* (citation omitted).  Next, the Court "determines the adverse claims between the claimants." *Id.*  Because John Hancock has already been discharged from the case, *see* Elec. Order dated Aug. 30, 2023, the Court turns to each relevant individual's entitlement to the proceeds of the Policies.

Ramcharitar claims entitlement to 90% of the life insurance proceeds, with the remaining ten percent divided evenly between Anisa and Hallima, based on the October 15, 2021 Change of Beneficiary Form. *See* Tr. 164:6-13; Ex. 3 at 5.  Stephen, on the other hand, asserts a number of affirmative defenses, seeking to invalidate the October 15, 2021 Change of Beneficiary Form, and asks the Court to distribute the proceeds of the Policies according to the December 5, 2017 Change of Beneficiary Form instead.  *See* Answer of Stephen Ali, DE [40], at 2.

### A. **Anisa's and Hallima's Default**

Initially, Hallima and Anisa failed to answer the Complaint or otherwise defend the action, and so on April 22, 2022, the Clerk of Court issued certificates of default against them. *See* DE [16].  In an interpleader action, a defaulting claimant is not entitled to proceeds. *See Great Am. Ins. Co. v. Gold Coast Exp. Inc.*, No. 12-CV-

8

4847, 2015 WL 1039770, at *3 (E.D.N.Y. Mar. 10, 2015) ("'The failure of a named interpleader defendant to answer the interpleader complaint and assert a claim to the res can be viewed as forfeiting any claim of entitlement that might have been asserted.'") (citing *Metro. Life Ins. Co. v. Little*, No. 13-CV-1059, 2013 WL 4495684, at *2 (E.D.N.Y. Aug. 17, 2013)); *JP Morgan Chase Bank, NA v. Meged Funding Grp. Corp.*, No. 23-CV-2605, 2024 WL 3995052, at *3 (E.D.N.Y. Aug. 29, 2024); *Chicago Title Ins. Co. v. Lumbermens Mut. Cas. Co.*, No. 22-CV-00768, 2022 WL 19520885, at *3 (E.D.N.Y. Dec. 23, 2022); *Wells Fargo Bank, N.A. v. Krenzen Auto Inc.*, No. 19-CV-5329, 2021 WL 695122, at *3 (E.D.N.Y. Feb. 23, 2021). Accordingly, neither Anisa nor Hallima are entitled to any portion of the proceeds of the Policies, and the Court must determine the proper beneficiary between Stephen and Ramcharitar.

B. **Stephen's Affirmative Defenses**

Turning to Stephen's affirmative defenses, because he proceeds *pro se*, the Court liberally construes these affirmative defenses and interprets them to raise the strongest arguments they suggest. *See Courchevel 1850 LLC v. Rodriguez*, No. 17-CV-6311, 2019 WL 2233828, at *5 (E.D.N.Y. May 22, 2019).

New York law applies here. A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012). Accordingly, the Court applies New York choice-of-law rules here. "New York looks to the 'center of gravity' of a contract," including an insurance policy, to determine choice of law. *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 135 (2d Cir. 2018) (citation omitted). "The two most important factors under

9

New York law are the place of contracting," that is, "the state in which the policy was negotiated, contracted, and signed," and "the place of performance," that is, "the location where the premiums are billed and a claim on the policy is made." *Id.* (citations omitted). Under New York law, "where the insured risk is scattered throughout multiple states, New York courts deem the risk to be located principally in one state, namely, in the state of the insured's domicile at the time the policy was issued." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 642 (2d Cir. 2016) (citation omitted).

Here, Zaimoon lived in New York when she applied for Policy 230. Ex. 20. As explained above, the application for Policy 688 is not in the record. Prior to her move from New York to Florida on a date uncertain, Zaimoon held a New York bank account, from which she presumably paid premiums. Tr. 113:19-20, 136:13-14. Two possible beneficiaries to the Policies, Stephen and Ramcharitar, live in Florida, while the other two, Anisa and Hallima, live in New York. *See* Tr. 1, Appearances, 100:8-9; Ex. 3 at 5. While Florida and New York both have an interest in the litigation, the Court applies New York law in analyzing Stephen's affirmative defenses of duress, undue influence, lack of capacity, and fraud in the inducement, principally because Zaimoon was domiciled in New York when she applied for Policy 230. *See Fireman's Fund Ins. Co.*, 822 F.3d at 642 (2d Cir. 2016).

### 1. *Duress and Undue Influence*

Initially, Stephen asserts duress and undue influence as separate affirmative defenses, and seeks to invalidate the October 15, 2021 Change of Beneficiary Form

10

under these theories.  *See* Answer, DE [40], at 2.  For the reasons set forth below, Stephen has failed to meet his burden.

Under New York state law, a party alleging duress may "void a contract . . . when it establishes that it was compelled to agree to the contract terms because of a wrongful threat by the other party which precluded the exercise of its free will." *805 Third Avenue Co. v. M.W. Realty Assoc.*, 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780 (1983) (internal citations omitted).  New York courts recognize duress by "physical compulsion, by threat, or by the exercise of undue influence." *Silver v. Starrett*, 176 Misc. 2d 511, 516, 674 N.Y.S.2d 915, 919 (Sup. Ct. N.Y. Cty. 1998) (citing *Evans v. Waldorf-Astoria Corp.*, 827 F. Supp. 911, 913 (E.D.N.Y. 1993), *aff'd*, 33 F.3d 49 (2d Cir. 1994)).  Because Stephen offers no testimony or evidence that Ramcharitar physically compelled or threatened Zaimoon, the Court construes Stephen's duress defense as an affirmative defense based on duress *via* undue influence and considers the two theories together.

A party contesting a change of beneficiary designation in an insurance policy on grounds of undue influence must show "(1) the existence and exertion of an influence; (2) the effective operation of such influence as to subvert the mind at the time the transaction occurred; and (3) the execution of the transaction that, but for undue influence, would not have happened." *New York Life Ins. Co. v. Brown*, 19-CV-09437, 2021 WL 325857, at *6 (S.D.N.Y. Feb. 1, 2021) (citation omitted).  To prove that a policyholder was unduly influenced, the party asserting the theory must show that another party "restrained [the policyholder's] independent action and destroyed

11

free agency." *In re Zirinsky*, 43 A.D.3d 946, 947-48, 841 N.Y.S.2d 637, 639 (2d Dep't 2007) (citing *In re Walther's Will*, 6 N.Y.2d 49, 53, 188 N.Y.S.2d 168, 172 (1959)). Further, the party challenging the change of beneficiary designation must show more than opportunity and motive to exercise undue influence: he must prove "that such influence was actually utilized." *Brown*, 2021 WL 325857, at *6. "While undue influence may be proved by circumstantial evidence, the circumstances must lead to it not only by fair inference but as a necessary conclusion." *Id.* (citation omitted).

Stephen has not met his burden to prove that Ramcharitar "restrained" Zaimoon's "independent action" or "destroyed [her] free agency" with respect to the relevant beneficiary change. *See In re Zirinsky*, 43 A.D.3d at 947-48, 841 N.Y.S.2d at 639. Zaimoon called John Hancock, requesting to change the beneficiaries of the Policies, and authorized Ramcharitar to speak on her behalf. Ex. 6. The is no evidence in the trial record that Ramcharitar even asked Zaimoon to make that phone call, let alone influenced her to do so. Moreover, while Ramcharitar filled out the October 15, 2021 Change of Beneficiary Form, *see* Tr. 39:22-40:4, Zaimoon signed it, which signature was witnessed by an unidentified individual. Ex. 3 at 8.

In his attempt to prove that Ramcharitar unduly influenced their mother, Stephen points to the voicemails she left Stephen in late October 2021. *See* Stephen Ali Closing Statement, DE [56]. While Zaimoon did leave Stephen a voicemail on October 28, 2021 complaining that Ramcharitar was focused on "money, money, money" and asked for her debit card, *see* Ex. 17, this topic of this voicemail was Ramcharitar's purchases with that card and his offer to order her more checks, not

12

on the October 15, 2021 Change of Beneficiary Form. Moreover, both Sheryl and Anisa testified that Ramcharitar purchased necessities for his mother, Tr. 102:11-16, 127:10-17, and Zaimoon explained in a video recording that she gave him her card to buy her items she requested. *See* Ex. 13. Accordingly, the October 28, 2021 voicemail, Ex. 17, does not establish undue influence.

The other three voicemails, Exs. 15, 16, and 18, are even less probative. In a voicemail dated October 24, 2021, Zaimoon asked Stephen to return her call and stating "something going on there. I need you to know what is going on," without any context. Ex. 15. Her October 25, 2021 voicemail explicitly concerned the Power of Attorney and did not reference the Policies. Ex. 16. Finally, on October 29, 2021, Zaimoon asked Stephen "bring some stuff to wash [her] hair" because her "head [was] stinking." Ex. 18. The rest of that voicemail is inaudible. None of the voicemails, either separately or together, establish undue influence as an affirmative defense invalidating the October 15, 2021 Change of Beneficiary Form, or that Zaimoon was influenced in any way on the date she executed that form.

### 2. *Lack of Capacity*

Next, Stephen asserts lack of capacity as an affirmative defense. *See* Answer, DE [40], at 2. For the reasons set forth below, the Court finds that Stephen has not carried his burden here either.

"In evaluating mental capacity, New York courts apply two different standards: one for contracts and one for testamentary instruments." *Brown*, 2021 WL 325857, at *6 (citation omitted). "The law is unclear with respect to which

13

standard applies to beneficiary changes under a life insurance policy." *Id.*; *see Metro. Life Ins. Co. v. Giscombe*, No. 19CV4463, 2022 WL 2467066, at *10 (E.D.N.Y. Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 2704572 (E.D.N.Y. July 12, 2022). Because "[t]he contract standard is more exacting than the testamentary standard," a policyholder who is capable of making beneficiary changes to her life insurance policy under the contract standard is capable under both. *Brown*, 2021 WL 325857, at *6; *see Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 326 (S.D.N.Y. 2014) ("The capacity standard for making a will is less rigorous than the competence standard for making a contract, as a will is sometimes made by a person who is ill and facing death.") (citation omitted); *Sun Life Assur. Co. of Canada (U.S.) v. Gruber*, No. 05-CV-10194, 2007 WL 4457771, at *14 (S.D.N.Y. Dec. 14, 2007), *aff'd sub nom. Sun Life Assur. Co. of Canada v. Gruber*, 334 F. App'x 355 (2d Cir. 2009) ("In this case, we consider only the contractual standard, since if [the policyholder] would be deemed capable of designating a beneficiary under the contractual standard, he would necessarily meet the less demanding testamentary standard.").

"In contract disputes, the test for a person's mental capacity is whether the person's mind was 'so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction.'" *Quinio v. Aala*, 344 F. Supp. 3d 464, 478-79 (E.D.N.Y. 2018) (citing *Rudolf Nureyev Dance Foundation v. Noureeva-Francois*, 7 F.Supp.2d 402, 416 (S.D.N.Y. 1998)). "'People who observe the [person] daily—family members, teachers, employers—are often most familiar with his or her capacity to cope with challenge and can illuminate for the jury' that person's

14

ability (or inability) to enter into a contract." *Id.* (citing *People v. Cratsley*, 86 N.Y.2d 81, 87-88, 629 N.Y.S.2d 992, 996 (1995)). "Under the contract standard[,] a person is presumed competent at the time of the performance of the challenged action and the burden of proving incompetence rests with the party asserting incapacity." *Brown*, 2021 WL 325857, at *7. Incapacity must be demonstrated at the time of the challenged transaction. *Feiden v. Feiden*, 151 A.D.2d 889, 890, 542 N.Y.S.2d 860, 862 (3rd Dep't 1989).

Here, the overwhelming weight of evidence points to Zaimoon's capacity to enter into a contract on October 15, 2021. Initially, Zaimoon is presumed to have had the mental capacity to make the relevant beneficiary changes. *Brown*, 2021 WL 325857, at *7. Trustbridge medical personnel described her as "alert" and "oriented" on October 9, 10 and 20, 2021. Ex. 10 at 2, 3, 7. Notably, Dr. Antonio Mendez described her as "alert" and "oriented" on October 9, the same day that she was administered morphine, and so the record does not reflect that her capacity was impacted at that time. *See id.* at 1-2. Further, Zaimoon was visited by volunteers on October 14, 15, 18, and 21, 2021, who described her as "alert and responsive" on October 14 and 21, 2021; and "awake and alert" on October 18, 2021. Ex. 9 at 1, 3-4. The volunteer who visited her on October 15, the day she executed the relevant change of beneficiary designation, stated that "Zaimoon and [he] spoke, and she offered [him] her life advice," as well as her "experiences of living in New York City." *Id.* at 2.

15

Moreover, both Sheryl and Anisa, who spoke with Zaimoon daily, insisted that she was lucid during the relevant period. *See* Tr. 106:3-4, 123:12-14. Sheryl testified that Zaimoon was "mentally . . . competent" and "talk[ed] . . . normal[ly]." Tr. 123:25-124:8. Sheryl further emphasized that there was "no" difference in her cognitive ability, and that Zaimoon's illness was not apparent during their communications. Tr. 124:3-12. As for Anisa, she testified that Zaimoon communicated clearly with her and did not "appear confused at any time." Tr. 98:3-10. Further, on the phone call that Ramcharitar and Zaimoon placed to John Hancock requesting to change her beneficiary designations, Zaimoon articulated her date of birth, spelled her full name and stated the last four digits of her Social Security Number without confusion or hesitation. Ex. 6. This clarity of speech leads the Court to conclude that Zaimoon had mental capacity to change the beneficiary designations of the Policies on October 15, 2021.

While Zaimoon did sound distressed and confused on later voicemails she left Stephen, *see* Exs. 15-19, these voicemails were left one to two weeks after October 15, 2021, and are therefore insufficient to establish lack of capacity. *See Feiden*, 151 A.D.2d at 890, 542 N.Y.S.2d at 862 (under New York law, incapacity must be demonstrated at the time the challenged contract was formed). Moreover, these voicemails, as explained above, do not address the changes to the Policies' beneficiary designations at all. Therefore, they do not demonstrate her inability to "understand the nature of the transaction" at issue. *Quinio v. Aala*, 344 F. Supp. 3d 464, 478-79

16

(E.D.N.Y. 2018). Accordingly, the Court concludes that Stephen has failed to meet his burden as to this affirmative defense.

### 3. *Fraud in the Inducement*

Finally, Stephen asserts an affirmative defense of fraud in the inducement for the first time in his closing statement. *See* Stephen Ali Closing Statement, DE [56]. Generally, courts do not consider new theories of liability or recovery raised for the first time at trial. *See Monz v. Rocky Point Fire Dist.*, 853 F. Supp. 2d 277, 285 (E.D.N.Y. 2012), *aff'd*, 519 F. App'x 724 (2d Cir. 2013); *Andrus v. Juniper Grp., Inc.*, No. 08-CV-1900, 2011 WL 4532694, at *4 (E.D.N.Y. Sept. 26, 2011). Courts considering whether to amend pleadings post-trial to include a new cause of action primarily consider whether the opposing party would be prejudiced by such an amendment. *See Monz*, 853 F. Supp. 2d at 285 ("[T]o allow Plaintiff to raise and argue a new theory of recovery at trial would seriously prejudice Defendants who had no opportunity to conduct discovery with respect to this issue or develop a defensive strategy."); *Andrus*, 2011 WL 4532694, at *4 (concluding that Defendant would be prejudiced by Plaintiff's introduction of alter-ego liability on the morning of trial); *Alberts v. City of New York*, 549 F. Supp. 227, 229 (S.D.N.Y. 1982).

"To maintain a cause of action for fraudulent inducement of contract, a plaintiff must show a material representation, known to be false, made with the intention of inducing reliance, upon which it actually relied, consequentially sustaining a detriment." *Frank Crystal & Co. v. Dillmann*, 84 A.D.3d 704, 704, 925 N.Y.S.2d 430, 431 (1st Dep't 2011). The essence of Stephen's fraudulent inducement defense is that

17

Ramcharitar filled out the October 15, 2021 Change of Beneficiary Form without following Zaimoon's wishes, "ma[d]e the beneficiary changes without [his] mother's knowledge," "gave himself . . . 90%" of the proceeds of the Policies, and then deceived Zaimoon into signing it. *See* Stephen Ali Closing Statement, DE [56], at 2-3. Stephen's answer contains no indication that he intended to raise this defense. *See* Answer, DE [40]. Moreover, at trial, Stephen only briefly reached the issue of why Ramcharitar, and not Zaimoon, filled out the October 15, 2021 Change of Beneficiary Form. *See* Tr. 72:14-73:20. This short line of cross-examination did not put Ramcharitar on notice that Stephen intended to prove that Ramcharitar had made a "material representation, known to be false" to Zaimoon about what the form she was signing actually said. *See Frank Crystal & Co.*, 84 A.D.3d at 704, 925 N.Y.S.2d at 431. Accordingly, the Court concludes that Ramcharitar would be prejudiced if Stephen were permitted to raise this affirmative defense post-trial, and declines to consider it. Moreover, even if the affirmative defense was properly pled, there was no evidence of a material misrepresentation or reliance at trial, and so the claim fails on the merits in any event.

### III.  CONCLUSION

For the foregoing reasons, the Court concludes that Robert Ramcharitar is entitled to the proceeds of the Policies, totaling $89,052.07. Further, the Court rejects Stephen Ali's affirmative defenses in their entirety for failure to carry their burden of proof, and, in the case of the defense of fraudulent inducement, for failure to

introduce that defense prior to trial. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

Dated:     Central Islip, New York
           September 26, 2024

<u>s/ Steven I. Locke</u>  
STEVEN I. LOCKE  
United States Magistrate Judge